**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION**

THE STATE OF MISSOURI,
ex rel. ANDREW BAILEY, in his official
capacity as Missouri Attorney General,

      Plaintiff,

      v.                       Case No.  4:24-cv-1063

JOSEPH BIDEN, in his official capacity as
President of the United States,

MERRICK GARLAND, in his official
capacity as Attorney General of the United
States,

TOM VILSACK, in his official capacity as
Secretary of Agriculture,

GINA M. RAIMANDO, in her official
capacity as Secretary of Commerce,

MIGUEL CARDONA, in his official
capacity as Secretary of Education,

JENNIFER GRANHOLM, in her official
capacity as Secretary of Energy,

XAVIER BECERRA, in his official
capacity as Secretary of the Health and
Human Services,

ALEJANDRO MAYORKAS, in his official
capacity as Secretary of Homeland Security,

ADRIANNE TODMAN, in her official
capacity as Secretary of Housing and Urban
Development,

DEBRA HAALAND, in her official
capacity as Secretary of the Interior,

1

|  |  |
|---|---|
| JULIE SU, in her official capacity as Secretary of Labor, | ) ) ) |
| ANTONY BLINKEN, in his official capacity as Secretary of State, | ) ) ) |
| PETE BUTTIGIEG, in his official capacity as Secretary of Transportation, | ) ) ) |
| JANET YELLEN, in her official capacity as Secretary of the Treasury, | ) ) ) |
| and | ) ) |
| DENIS McDONOUGH, in his official capacity as Secretary of Veterans Affairs, | ) ) ) |
| Defendants. | ) |

---

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

---

## INTRODUCTION

1.      Andrew Bailey, representing the State of Missouri ("Plaintiff"), brings this action against the named federal officials and agencies asking this Court to enter a declaratory judgment and enjoin such federal officials and agencies in accordance with this Complaint pursuant to Federal Rules of Civil Procedure 57 and 65.

2.      On March 7, 2021, President Biden signed Executive Order Number 14019 (EO 14019).    A copy of EO 14019 is attached at **Exhibit A** and also available at https://www.whitehouse.gov/briefing-room/presidential-actions/2021/03/07/executive-order-on-promoting-access-to-voting/.

3.    Executive Order 14019 is an unconstitutional overreach by the Biden Administration and impermissibly inserts federal agencies and employees into matters reserved to the states.  It does so by targeting demographic groups long-recognized as voting predominately for one political party and then directing federal agencies to use their resources to increase voter registration and voter turnout among these select groups.

4.    Plaintiff recognizes the long and shameful history of racial discrimination in the context of voting laws in the United States.  Efforts to remedy this historical injustice have come in the form of federal legislation such as the Voting Rights Act and a number of other state and federal laws.  However, attempts to ensure equal treatment under the law cannot justify additional forms of discrimination and disparate treatment of one group over another.  *See Students for Fair Admission, Inc. v. Harvard,* 600 U.S. 181, (2023).

5.    The Biden Administration's order specifically engages in discriminatory targeting of specific groups based on classifications such as race.  The EO directs federal agencies to use public resources to focus on "Black voters and other voters of color," to the necessary exclusion of other groups.

6.    Specifically, EO 14019 directs federal agencies to engage in activities directly and in concert with "authorized" third-party organizations to engage in a voter registration and mail-in voting scheme.

7.    The third-party organizations hand-picked by Defendants are politically engaged groups that have been chosen for their abilities to target and register voters who will support the Biden Administration at the ballot box.

8.    This presidential directive requires federal agencies and employees to use executive agency personnel, resources, and taxpayer funds to promote a voter registration and mail-in ballot

campaign by "approved" nonpartisan organizations.  Executive Order 14019 directs federal agencies to contribute work by federal employees and use of federal facilities for these efforts.

9.      President Biden's EO 14019 has ordered mobilization of federal agencies and federal employees to use federal resources to conduct a "get out the vote" (GOTV) and ballot-harvesting campaign in conjunction with "approved" third-party organizations.

10.     President Biden's executive order is unconstitutional and contrary to federal law. Congress has not passed legislation expanding the President's authority.  Rather, Executive Order 14019 is an exercise of raw power that violates the United States Constitution and federal law in a number of ways: (1) EO 14019 violates the procedures set forth in the Administrative Procedures Act (APA), (2) EO 14019 is an executive order of the President without any congressional authorization in violation of the Separation of Powers;[1] (3) EO 14019 imposes burdens and costs upon state and local government to respond to this federally mandated election scheme in violation of constitutional principles of federalism;[2] (4) EO 14019 violates the Elections Clause of the Constitution, Art. I, § 4, cl. 1; and (5) EO 14019 directs federal executive branch employees to violate the Hatch Act, 5 U.S.C. §§ 7321-26, and engage in forbidden partisan political activity.

---

[1] See, *e.g.*, *Food & Drug Admin. v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 378 (2024) ("Importantly, separation of powers 'was not simply an abstract generalization in the minds of the Framers: it was woven into the document that they drafted in Philadelphia in the summer of 1787.'") (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 422-23 (2021)); *Consumer Fin. Prot. Bureau v. Community Fin. Servs. Ass'n of America, Ltd.*, 601 U.S. 416, 437 (2024) ("the Bureau's funding mechanism provides a blueprint for destroying the separation of powers, and [ ] it invites tyranny by allowing the Executive to operate free of any meaningful fiscal check"); *Clinton v. City of New York*, 524 U.S. 417, 450 (1998) ("Separation of powers was designed to implement a fundamental insight: Concentration of power in the hands of a single branch is a threat to liberty.  The *Federalist* states the axiom in these explicit terms: 'The accumulation of all powers, legislative, executive, and judiciary, in the same hands . . . may justly be pronounced the very definition of tyranny.'") (Kennedy, J., concurring) (quoting *Federalist No. 47* (C. Rossiter ed. 1961), p. 301).

[2] See *Printz v. United States*, 521 U.S. 898, 925-26 (1997).

11.     Plaintiff, State of Missouri, has a responsibility for the conduct of its own elections and is, (and will further be) injured by the implementation of EO 14019 and the substantial costs it imposes upon state officials and agencies and state resources.

12.     This Court can and should enjoin Defendants, President Biden and the named federal agencies, from implementing EO 14019.

## THE PARTIES TO THIS LAWSUIT

### A.     The Plaintiff

13.     Plaintiff State of Missouri is a sovereign state of the United States, and Andrew Bailey is the Missouri Attorney General, who represents and is the relator for the State of Missouri in this action.  Mo. Rev. Stat. § 27.060.

14.     Under Missouri law, county clerks are responsible for administering and conducting elections in the clerk's respective county.  Mo. Rev. Stat. § 115.015.  A county clerk's duties and responsibilities include "conduct[ing] all public elections" within the county, "mak[ing] all rules and regulations . . . necessary for the registration of voters," publishing notices of elections, registering voters, providing and testing voting equipment, appointing and training election judges, and employing staff necessary to assist in those duties.  *Id.*; *see also* §§ 115.023, 115.043, 115.051, 115.079.  Where an electronic voting system or voting machines are used, the county clerk shall designate competent employees to have custody of and supervise maintenance of the voting equipment.  *See* Mo. Rev. Stat. § 115.051.  The county clerk is responsible for voter registration, maintaining a current and accurate voter roll, deleting ineligible names from the voter roll, and training subordinate officials, such as election judges, in the conduct of the election, including voter identification and processing requests for absentee ballots and mail-in ballots.  *See* Mo. Rev. Stat. §§ 115.079, 115.081, 115.103, 115.158.

**B.      The Defendants**

15.      President Joseph Biden, who is named as a defendant in his official capacity as President of the United States.

16.      Attorney General Merrick Garland, who is named as a defendant in his official capacity, leads the Department of Justice, which is an executive agency of the United States government.  The Department of Justice is an executive branch agency subject to EO 14019.

17.      Secretary Tom Vilsack, who is named as a defendant in his official capacity, leads the Department of Agriculture, which is an executive agency of the United States government. The Department of Agriculture is an executive branch agency subject to Executive Order 14019 (EO 14019) that is the subject of this litigation.

18.      Secretary Gina M. Raimando, who is named as a defendant in her official capacity, leads the Department of Commerce, which is an executive agency of the United States government.  The Department of Commerce is an executive branch agency subject to EO 14019.

19.      Secretary Miguel Cardona, who is named as a defendant in his official capacity, leads the Department of Education, which is an executive agency of the United States government. The Department of Education is an executive branch agency subject to EO 14019.

20.      Secretary Jennifer Granholm, who is named as a defendant in her official capacity, leads the Department of Energy, which is an executive agency of the United States government. The Department of Energy is an executive branch agency subject to EO 14019.

21.      Secretary Xavier Becerra, who is named as a defendant in his official capacity, leads the Department of Health and Human Services, which is an executive agency of the United States government.  The Department of Health and Human Services is an executive branch agency subject to EO 14019.

22.      Secretary Alejandro Mayorkas, who is named as a defendant in his official capacity,

leads the Department of Homeland Security, which is an executive agency of the United States government.  The Department of Homeland Security is an executive branch agency subject to EO 14019.

23.    Secretary Adrianne Todman, who is named as a defendant in her official capacity, leads the Department of Housing and Urban Development, which is an executive agency of the United States government.  The Department of Housing and Urban Development is an executive branch agency subject to EO 14019.

24.    Secretary Debra Haaland, who is named as a defendant in her official capacity, leads the Department of the Interior, which is an executive agency of the United States government.  The Department of the Interior is an executive branch agency subject to EO 14019.

25.    Secretary Julie Su, who is named as a defendant in her official capacity, leads the Department of Labor, which is an executive agency of the United States government.  The Department of Labor is an executive branch agency subject to EO 14019.

26.    Secretary of State Antony Blinken, who is named as a defendant in his official capacity, leads the Department of State, which is an executive agency of the United States government.  The Department of State is an executive branch agency subject to EO 14019.

27.    Secretary Pete Buttigieg, who is named as a defendant in his official capacity, leads the Department of Transportation, which is an executive agency of the United States government.  The Department of Transportation is an executive branch agency subject to EO 14019.

28.    Secretary Janet Yellen, who is named as a defendant in her official capacity, leads the Department of the Treasury, which is an executive agency of the United States government.  The Department of the Treasury is an executive branch agency subject to EO 14019.

29.    Secretary Denis McDonough, who is named as a defendant in his official capacity,

leads the Department of Veterans Affairs, which is an executive agency of the United States government. The Department of Veterans Affairs is an executive branch agency subject to EO 14019.

## THIS COURT HAS JURISDICTION AND VENUE IS PROPER

30.  Plaintiff seeks prospective declaratory and injunctive relief to prevent the burdens and injury that the implementation of EO 14019 will impose upon them.

31.  The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, 1346 and 1361. This action arises under the Constitution and laws of the United States. This Court has jurisdiction to render declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

32.  Plaintiff has a cause of action under the Administrative Procedure Act (APA) pursuant to 5 U.S.C. §§ 702, 706 because Plaintiff is adversely affected by Defendant federal agencies' actions in its implantation of the EO 14019, a final agency action as defined by 5 U.S.C. §704. Plaintiff seeks equitable relief, having no other adequate remedy, and accordingly seeks judicial review of these agency actions.

33.  Venue lies in this district pursuant to 28 U.S.C. § 1391(e) as Plaintiff State of Missouri resides in the Eastern District of Missouri. Missouri is a resident of every judicial district and division within its sovereign territory, including this judicial district and division. *See, e.g.*, *California v. Azar*, 911 F.3d 558, 569–70 (9th Cir. 2018) ("[A] state with multiple judicial districts 'resides' in every district within its borders."); *Alabama v. U.S. Army Corps of Eng'rs*, 382 F. Supp. 2d 1301, 1329 (N.D. Ala. 2005) ("[C]ommon sense dictates that a state resides throughout its sovereign borders.").

## FACTUAL ALLEGATIONS

34.  Executive Order 14019 requires that "the head of each federal agency shall evaluate ways in which the agency can . . . promote voter registration and voter participation . . . in the

course of activities or services that directly engage with the public – including through agency materials, websites, online forms, social media platforms, [information about how to] register to vote, how to request a vote-by-mail ballot, and how to cast a ballot in upcoming elections." EO 14019.3.

35.    Executive Order 14019 directs federal agencies, officials and employees "to facilitate seamless transition from agencies' websites directly to State online voter registration systems" and determine "ways to provide access to voter registration services and vote-by-mail activities or services that directly engage with the public." EO 14019.3(a)(ii), (iii).

36.    Federal agencies are directed to "distribute[] voter registration and vote-by-mail ballot application forms, and provid[e] access to applicable State online systems," "assist[] applicants in completing voter registration and vote-by-mail ballot application forms," "solicit[] and facilitate[e] approved nonpartisan third-party organizations and State officials to provide voter registration services," and "promote and expand access to multilingual voter registration and election information...." EO 14019.3(a)(iii), (iv).

37.    Executive Order 14019 further mandates consideration of "whether, consistent with any applicable law, any identity documents issued by the agency to members of the public can be issued in a form that satisfies State voter identification laws." EO 14019.3(a)(v).

38.    Executive Order 14019's requirement that federal agencies issue voter identification documents (quoted above) is especially troubling for several reasons.

39.    One of the agencies subject to EO 14019 is the Department of Homeland Security.

40.    The Department of Homeland Security (DHS), at the direction of the Biden Administration, is allowing millions of illegal aliens to enter the country. In some cases, illegal aliens that are encountered by DHS are issued documents that allow them to travel throughout the

nation on commercial or chartered aircraft or buses.  Although ineligible to participate in U.S. elections, the documents the Department of Homeland Security issues will be (and almost certainly are being) used by these non-citizens who are illegally residing in the United States to register to vote and cast mail-in ballots.

41.     The United States Constitution vests the primary responsibility for conducting elections for public office with state individual states and state officials.

42.     The primacy of state law is clear, modified only by specific provisions of the Fourteenth, Fifteenth, Nineteenth, and Twenty-Sixth Amendments. In Art I, § 1 and then again in the 17th Amendment, states are specifically authorized to regulate and conduct elections — "The electors in each state shall have the qualifications requisite for electors of the most numerous branch of the state legislatures" — over who is allowed to vote for members of congress. Since voter registration and identification is a lesser included power related to who is allowed to vote, the federal government has no general authority over voter registrations.

43.     But, even if the Elections Clause were controlling, under the Elections Clause it is the responsibility of states to regulate the "time, place, and manner" of elections.  See U.S. CONST. Art. I, §4 cl. 1.

44.     Plaintiff and election authorities in Missouri responsible for elections have a compelling constitutional interest in the "fair, honest, and orderly" conduct of these elections. *Libertarian Party of N. Dakota v. Jaeger*, 659 F.3d 687, 693 (8th Cir. 2011).  States may seek "to assure that elections are operated equitably and efficiently."  *Burdick v. Takushi*, 504 U.S. 428, 433 (1992).  Missouri has that interest.

45.     As opposed to the clear authority of the states to oversee and manage the conduct of elections, the Biden Administration has attempted to manufacture authority with an Executive

Order anchored firmly in thin air.  This action is a transparent attempt to impermissibly tilt the balance of power towards the federal government by changing the rules governing elections by executive fiat.

46.    Pursuant to a constitutional grant of authority, Missouri has established voter eligibility, registration, and identification requirements applicable to those seeking to cast a ballot in state and federal elections.  Missouri law requires that voters register and verify their identity through photo identification from an approved list that includes a Missouri driver's license or a non-driver's license. (See § 115.427, RSMo).  State statute also authorizes certain designated forms of federal photo identification (such as passports, military and official employment identification issued to federal employees) but this list does not include documents issued by federal agencies such as those contemplated in EO 14019 to be acceptable photo identification necessary to validate a person's eligibility to cast a ballot.  *Id.*

47.    President Biden and his supporters have attempted to advance their electoral prospects by opening up new paths to allow illegal aliens to vote in U.S. elections.  Andrea Castillo & Cindy Carcamo, *Biden to Offer Legal Status to 11 Million Immigrants, Plans to Stop Border Wall Construction*, L.S. TIMES (Jan. 20, 2021), https://tinyurl.com/LA-Times-Immigration-Plan.

48.    Such efforts are part of a calculated effort to increase voter turnout among demographic groups expected to vote for the President's political party.  See Eileen Patten & Mark Hugo Lopez, *Are Unauthorized Immigrants Overwhelmingly Democrats?,* PEW RSCH. CTR. (July 22, 2013), https://tinyurl.com/Pew-Alien-Polls.

49.    In addition to federal encroachment on State authority to conduct elections, many of the agency actions that result from EO 14019 will tend to increase the administration burden on States and their election authorities.

50.     Novel forms of documents issued by federal agencies pursuant to EO 14019 will be confusing to local election officials and make the administration of elections more difficult and less uniform.  For example, state officials might be called upon to determine what form of identification document issued by the Department of Education or the Environmental Protection Agency or the Department of Energy to persons who are not employees of these agencies will satisfy state voter identification laws.

51.     Among its other provisions, EO 14019 states that President Biden signed this Order for the express purpose of increasing voting among limited racial groups, stating, "many Americans, *especially people of color*, confront significant obstacles to exercising that fundamental right."  (emphasis added).  "These obstacles include difficulties with voter registration, lack of election information, and barriers to access at polling places.  For generations, *Black voters and other voters of color* have faced discriminatory policies and other obstacles that disproportionally affect their communities."  (emphasis added).  This is a race-based distinction and preference that the Constitution forbids.  See, *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 208 (2023) ("Our acceptance of race-based state action has been rare for a reason.  Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality.") (internal quotations omitted).

52.     Executive Order 14019 requires federal agencies to develop a strategy and specific plans to accomplish the objectives of EO 14019 between 200 and 270 days after March 7, 2021 (between September 23, 2021, and December 2, 2021).

53.     Executive Order 14019 requires, *inter alia*, federal officials and agencies to use federal taxpayer money and resources to fund what is, in all practical effect, a get-out-the-vote and

ballot harvesting scheme favoring a select demographic of the electorate that favors President Biden and the his political party.

54.    Get out the vote (GOTV) efforts are inherently political, and thus will always favor one political party over another.  Far from being neutral, the results of increased registrations for one or another political party is invariably linked to which regions, demographic groups or precincts may be targeted.  Studies show that GOTV programs boost turnout by "voters whose minds are already made up."  Dylan Matthews, *A massive new study reviews the evidence on whether campaigning works. The answer's bleak.*, VOX (Sept. 28, 2017 8:00 AM), https://tinyrul.com/4nn9z28f (citing Joshua Kalla & David E. Broockman, *The Minimal Persuasive Effects of Campaign Contact in General Elections:  Evidence from 49 Field Experiments*, 112 AM. POL. SCI. REV. 148 (2017).

55.    One particularly relevant example was a much-criticized GOTV effort focused on areas (Congressional districts, etc.) that favored now President Biden's political party and was funded largely by Facebook founder Mark Zuckerberg through a designated nonprofit organization.  In 2020, the Chan Zuckerberg Initiative cumulatively donated around $300,000 to CTCL, which was spent on election administration. Michael Scherer, *Mark Zuckerberg and Priscilla Chan Donate $100 Million More to Election Administrators, Despite Conservative Pushback*, WASH.POST(Oct. 13, 2020), https://tinyurl.com/3yrn9wn6; Tom Scheck, Geoff Hing, Sabby Robinson & Gracie Stockton, *How Private Money From Facebook's CEO Saved The 2020 Election*, Nat'l Pub. Radio (Dec. 8, 2020), https://tinyurl.com/yc2s83wt.

56.    Following the 2020 elections, at least twenty-seven States banned private dollars being used to fund election activities, both for voter registration activities and GOTV efforts.  Matt

Vasilogambros, *28 States Have Banned or Restricted Private Funds for Elections*, GOVERNING (Apr. 29, 2024), https://tinyurl.com/Ban-Private-Funds-Elections.

57.    Agency actions demanded by the Biden Administration to implement EO 14019 are the next iteration of "Zuckerbucks" (as Mark Zuckerberg's efforts to privately fund elections came to be known), replacing privately paid workers with taxpayer-funded federal government employees and contractors, using the vastly superior reach and resources of the Federal Government.

58.    The Heritage Foundation has prepared memoranda describing EO 14019 and has gathered documents federal agencies have prepared in response to EO 14019. The agencies provided this information in response to Freedom of Information Act requests. See **Exhibit B** (copy of Heritage Foundation memoranda with exhibits).

59.    The federal agencies President Biden directed to take action pursuant to EO 14019 have not disclosed what specific actions they will take or have taken to implement EO 14019The federal agencies subject to EO 14019 have not engaged in the rule-making and administrative requirements necessary to implement the action President Biden directed the agencies to take in EO 14019.

60.    Recently, on June 13, 2024, the House Committee on Administration (the committee with jurisdiction of federal elections) subpoenaed fifteen Biden Administration cabinet officials requiring them to provide documents related to EO 14019. See **Exhibit C** .[3]

---

[3] The House subpoenas were directed to the Secretaries of the Departments of Transportation, Agriculture, Interior, Treasury, State, Homeland Security, Health and Human Resources, Energy, Education, Defense, Commerce, Justice, Labor, Housing and Urban Development, and the Office of Management and Budget.

61.     The House Oversight and Accountability Committee is pursuing a separate investigation of EO 14019.  See **Exhibit D** (copy of May 13, 2024, letter from members of the House Oversight Committee).

62.     President Biden unlawfully seeks to use federal government resources to aid his campaign to have his hand-selected candidate be elected as President of the United States by enlisting the immense federal bureaucracy in a get-out-the-vote and ballot harvesting campaign.

63.     Executive Order 14019 requires all federal agencies to identify and partner with specified partisan third-party organizations chosen by the Biden administration whose names and roles are not transparent but are willfully withheld from the public.

64.     Executive Order 14019 directs taxpayer resources to be used to support the efforts of the third-party organizations to do voter registration drives and mail-in voting.

65.     The EO requires federal agencies to identify and partner with third-party groups that have been chosen specifically for their ideological leanings and their willingness to help register voters who favor progressive policies generally and the Administration' favored political party.  For example, one media report states that: "On July 12, 2021, the Justice Department held a 'listening session' with outside activists working on voting rights.  The group included dozens of people, all of them from left-leaning groups.  There were 10 from the American Civil Liberties Union, five from the Campaign Legal Center, three from Demos, three from the Southern Poverty Law Center, five from the Leadership Conference on Civil Rights, two from Black Lives Matter, and many others."  Byron York, *Joe Biden's secret voter plan*, WASH. EXAMINER (Sept. 12, 2022), https://tinyurl.com/zks6vafw (citing FOIA email, https://thefga.org/wp-content/uploads/2022/09/CRT-9-8-22-Production-FGA_section-17.pdf).

15

66.    Executive Order 14019, which was largely drafted by a third-party, nongovernmental activist organization, requires public officials to solicit and enter into partnership agreements with third-party nongovernmental organizations to conduct voter registration drives and get-out-the-vote activities.  (available at: https://www.demos.org/policy-briefs/executive-action-advance-democracy-what-biden-harris-administration-and-agencies-can) (last visited July 31, 2024).

67.    Executive Order 14019 is not the first time the Biden Administration has made unconstitutional decisions without appropriate authorization.  The Administration previously attempted to cancel $430 billion in student debt, which the United States Supreme Court declared to be unconstitutional after the Missouri Attorney General led a coalition of other states challenging that effort. *Biden v. Nebraska*, 143 S. Ct. 2355 (2023).

68.    In response to Missouri's lawsuit, the Supreme Court held the State of Missouri had standing to challenge the Administration's mass student loan cancellation plan.  The Court held Biden's student loan debt cancellation scheme was unconstitutional because Congress did not authorize the Secretary of Education to cancel student loan debt by executive agency action.  In the words of the Supreme Court, the cancellation program lacked "clear congressional authorization." 143 S. Ct. at 2375.

**PLAINTIFF HAS STANDING TO CHALLENGE EXECUTIVE ORDER 14019**

69.    The state of Missouri, through its Attorney General, has standing to challenge President Biden's executive order directing federal agencies to engage in a get-out-the-vote and ballot harvesting campaign.

70.    Because the Plaintiff State of Missouri has suffered (and will suffer) a "concrete particularized, and actual or imminent" injury that is caused by (or will be caused by) the defendant

agencies implementing EO 14019, Plaintiff has standing to seek a declaratory judgment and related injunctive relief. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).

71.     The Supreme Court's recent decisions on standing hold that a plaintiff satisfies the "case and controversy" requirement of Article III necessary to establish standing if the party has a "personal stake" in the case, "[t]hat is, the plaintiff must have suffered an injury in fact — a concrete and imminent harm to a legally protected interest, like property or money — that is fairly traceable to the challenged conduct and likely to be redressed by the lawsuit." *Biden v. Nebraska*, 143 S.Ct. 2355, 2365 (2023) (quoting *TransUnion LLC v. Ramirez*, 141 S.Ct. 2190, 2203 (2021), and *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). See also *Food & Drug Admin. v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 379 (2024) ("For a plaintiff to get in the federal courthouse door and obtain a judicial determination of what the governing law is, the plaintiff cannot be a mere bystander, but instead must have a 'personal stake' in the dispute. The requirement that the plaintiff possess a personal stake helps ensure that courts decide litigants' legal rights in specific cases, as Article III requires, and that courts do not opine on legal issues in response to citizens who might 'roam the country in search of governmental wrongdoing.'") (internal citations omitted) (quoting, *inter alia*, *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 487 (1982)).

72.     The Plaintiff easily satisfies these criteria necessary to establish the standing to challenge the legitimacy of President Biden's EO 14019. Plaintiff has demonstrated "injury in fact" and have – and will continue – to incur this injury and the costs due to the implementation of EO 14019 unless this Court enjoins the implementation of EO 14019.

73.     Furthermore, the Plaintiff has a compelling constitutional interest in assuring that elections are conducted in a fair, honest, and orderly manner that inspires public confidence in the

integrity of the outcome.  See *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 196 (2008) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters.  Moreover, the interest in orderly administration and accurate recordkeeping provides a sufficient justification for carefully identifying all voters participating in the election process.").

74.    The States and its election officials have an interest in protecting public confidence "in the integrity and legitimacy of representative government." While that interest is closely related to the State's interest in preventing voter fraud, public confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process. As the Carter–Baker Report observed, the "'electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters.' " *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196-197 (2008).  See also *Building Confidence in U.S. Elections* (Carter-Baker Report) § 2.5 (Sept. 2005) (quoted by the Court in *Crawford*, 553 U.S. at 193-94).

75.    The Supreme Court in *Crawford* held, "[o]ne strong and entirely legitimate state interest is the prevention of fraud. Fraud can affect the outcome of a close election, and fraudulent votes dilute the right of citizens to cast ballots that carry appropriate weight. Fraud can also undermine public confidence in the fairness of elections and the perceived legitimacy of the announced outcome.  Ensuring that every vote is cast freely, without intimidation or undue influence, is also a valid and important state interest. This interest helped to spur the adoption of what soon became standard practice in this country and in other democratic nations the world round: the use of private voting booths." (Citing *Burson v. Freeman*, 504 U.S. 191, 202–205 (1992) (plurality opinion)).

76.    "A State indisputably has a compelling interest in preserving the integrity of its election process." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (*per curiam*) (internal quotation marks omitted). Limiting the classes of persons who may handle early ballots to those less likely to have ulterior motives deters potential fraud and improves voter confidence. That was the view of the bipartisan Commission on Federal Election Reform chaired by former President Jimmy Carter and former Secretary of State James Baker. The Carter-Baker Commission noted that "[a]bsentee balloting is vulnerable to abuse in several ways: . . . Citizens who vote at home, at nursing homes, at the workplace, or in church are more susceptible to pressure, overt and subtle, or to intimidation." *Report of the Comm'n on Fed. Election Reform, Building Confidence in U.S. Elections* 46 (Sept. 2005) (The Carter Baker Commission).

77.    The Carter Baker Commission warned that "[v]ote buying schemes are far more difficult to detect when citizens vote by mail," and it recommended that "States therefore should reduce the risks of fraud and abuse in absentee voting by prohibiting 'third-party' organizations, candidates, and political party activists from handling absentee ballots." *Ibid.* The Commission ultimately recommended that States limit the classes of persons who may handle absentee ballots to "the voter, an acknowledged family member, the U.S. Postal Service or other legitimate shipper, or election officials." *Id.* at 47.

78.    The Plaintiff's interest in the need to maintain a current accurate voter roll that includes only the names of citizens eligible to cast a ballot and to assure that the ballots actually cast and counted are those cast by citizens eligible to cast a ballot is a compelling interest. The implementation of EO 14019 will undermine this interest and the Plaintiff's ability to responsibly oversee fair, just, and honest elections.

79. Plaintiff has suffered "an injury in fact" because EO 14019 requires that state personnel and local election officials spend state funds and resources in response to the EO 14019 get-out-the-vote mail-in voting scheme.

80. The processing of these voter registration forms or mail-in ballot applications, many of which are duplicates, ineligible, or in the name of illegal migrants imposes a significant expense and burden upon state and local election officials that must review and vet the eligibility of these documents.

81. Missouri local election officials and county clerks have to review and process each new registration obtained by the defendant agencies pursuant to EO 14019 for citizenship. The review and vetting of these voter registration applications and requests for mail-in ballots imposes a significant administrative burden and cost upon county clerks and election officials.

82. Executive Order 14019's imposition of this burden and cost upon state and local officials is unconstitutional. *Printz*, 521 U.S. 898 (obligation to conduct background checks on prospective handgun purchasers imposed unconstitutional obligation on state officers to execute federal laws).

83. State and local election officials will be additionally burdened by the need to review the identification documents the agencies issue pursuant to EO 14019.3(a)(v). These documents are not designated as acceptable identification documents under state law. Federal agencies issuing documents that purport to satisfy state voter identification requirements will require training and other burdensome activities by state and local election officials solely as a result EO 14019.

**COUNT I**

**VIOLATION OF TENTH AMENDMENT AND FEDERALISM**

84.     The structure of the U.S. Constitution and the text of the Tenth Amendment protect federalism.

85.     The powers not delegated by the Constitution to the federal government are reserved to the States.

86.     Executive Order 14019 seeks to exercise power far beyond what was delegated to the federal government by constitutional mandate or congressional action.

87.     Neither Article II of the U.S. Constitution nor any act of Congress authorizes the President to issue an executive order turning federal agencies into partisan participants in a GOTV effort.

88.     The power to conduct elections is predominantly reserved to the States except where explicit Constitutional authority is granted to Congress.

89.     Any federal action regarding elections must be authorized by Congress in a statute.

90.     States have primacy in conducting elections, so federal actions involving elections inherently carry federalism implications.  *See Cook v. Gralike*, 541 U.S. 510, 523 (2001).

91.     By interfering with the traditional balance of power between the States and the federal government, and by acting pursuant to *ultra vires* federal action, the President's Executive Order 14019 violated the Tenth Amendment and structural principles of federalism.

92.     The APA requires that an agency cannot exceed the limits of what Congress conveyed to that agency by statute.  *West Virginia v. EPA*, 597, U.S. 697, 723 (2022).

93.     The power to override traditional State sovereignty over elections is, thus, strictly and exclusively vested in "the Congress" as a lawmaking power and in no other branch of the

federal government.  See U.S. CONST. Art. I, §4, cl. 1.  See also, *Loper Bright Enterprises v. Raimondo*, 602 U.S. __ (2024).

94.    The EO 14019 scheme by which President Biden directs federal agencies to implement a get-out-the-vote and ballot harvesting campaign that enrolls state and local election officials violates the "system of 'dual sovereignty'" the Constitution established. *See Printz*, 521 U.S. at 918 (citing and quoting *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991) and *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990)).

95.    Executive Order 14019 purports to supplant or circumvent or, at a minimum, confound and confuse states' voter identification statutes and requirements by adding a category of identification documents that may not satisfy state law voter identification requirements and would not be familiar to the state and state election officials. Various federal agencies issuing documents that purport to comply with state voter identification requirements (which documents are unfamiliar to state election officials) will create confusion in a state's ability to uniformly and equally administer the state's voter identification laws.

96.    For all these reasons, Executive Order 14019 was issued pursuant to an unconstitutional exercise of authority and must be invalidated.

## COUNT II

## VIOLATION OF THE SEPARATION OF POWERS

97.    Through the Administrative Procedures Act (APA), Plaintiff has an "interest in reinforcing … structural separation of powers principles." *California v. Trump*, 963 F.3d 926, 943 (9th Cir. 2020).

98.    Unconstitutional agency action violates the APA.  *See* 5 U.S.C. § 706.

99.     Constitutional violations are also actionable independent of the APA.  Federal courts have long exercised the power to enjoin federal officers from violating the Constitution, pursuant to their inherent equitable powers.  See *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327-28 (2015) (discussing "a long history of judicial review of illegal executive action, tracing back to England").

100.     Our Constitution is designed to separate the Powers the people granted the federal government between the Legislative, Executive, and Judicial branches.  As each branch's name suggests, they have specific authority to act in a sphere of our civil government.  The Legislative Branch – Congress, composed of the House and Senate – enacts laws and appropriates funds.  The Executive Branch executes the laws and oversees the spending of those funds Congress appropriates.  The Executive Branch (that is to say, the President) has no authority to act or to spend funds beyond that authority granted the President as Chief Executive and as delegated by Congress.  See *Loper Bright Enterprises v. Raimondo*, 2024 WL 3208360, at 22 (S.Ct. June 28, 2024) ("when a particular statute delegates authority to an agency *consistent with constitutional limits*, courts must respect the delegation, *while ensuring that the agency acts within it*") (emphasis added).

101.     Executive Order 14019 is not authorized by Congress.  There is no statute by which Congress authorized federal agencies to take that action President Biden directs in EO 14019.  Executive Order 14019 stands in marked contrast to legislation Congress has adopted concerning the conduct of federal elections.  For example, consider the Voting Rights Act of 1965, the National Voter Registration Act of 1993, and the Help America Vote Act of 2002.  These statutes illustrate the fundamental point that, when the federal government takes action concerning the conduct of elections, the President must only act pursuant to congressional authorization.

23

102.     EO 14019 is not just action by President Biden without congressional authorization, it is an order by President Biden that is *contrary* to law because EO 14019 directs federal officials and employees to take action forbidden by the Hatch Act.  See Count IV infra.

103.     Where, as here, the President has taken such action overstepping his constitutional authority, his Executive Order violates the principle of the separation of powers, it must be struck down and its enforcement by federal agencies enjoined.

## COUNT III

## CONTRARY TO CONSTITUTIONAL AUTHORITY - ELECTIONS AND ELECTORS CLAUSES AND THE TENTH AMENDMENT

104.     The Elections Clause and the Electors Clause of the Constitution recognize the primacy of state legislatures in the federal electoral process, with a limited federal role.

105.     The Elections Clause of the Constitution governs the election of Members of Congress and provides, in relevant part, that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but Congress may at any time by Law make or alter such Regulations, except as to the Places of choosing Senators."  U.S. CONST. art. I, § 4, cl. 1."

106.     As such, the Elections Clause directs the states to determine the "times, place and manner" of elections including representatives to the House and senators and presidential electors.

107.     States are the primary authority regulating and conducting elections for federal office.  States have primary responsibility for conducting elections and establishing the rules governing the participation in, and administration of, elections.

108.     Executive Order 14019 upsets the balance between state and federal elections responsibilities and circumvents Congressional authority.

109.    State election administrators have the right under the Elections and Electors Clauses and the Tenth Amendment to conduct elections according to the manner prescribed by state and federal legislatures, without modification by federal agency actions that do not properly flow from Acts of Congress.

110.    Agency actions based on EO 14019 violate Plaintiff's rights under the Elections and Electors Clauses by interfering with the rights and responsibilities of the States, and they violate the Tenth Amendment.

111.    The agency actions implementing the EO therefore violate the APA because they are "contrary to constitutional right." 5 U.S.C. § 706(2)(B). Accordingly, this Court should hold EO 14019 invalid and enjoin its implementation by federal agencies.

## COUNT IV

## VIOLATION OF LAW - HATCH ACT

112.    The Hatch Act, Pub. L. No. 89-554, 80 Stat. 525 (1939), as amended, restricts political activities by federal employees. "The law's purposes are to ensure That federal programs are administered in a nonpartisan fashion…." Congress' policy in the Hatch Act includes "that employees should be encouraged to exercise fully, freely, and without fear … their right to … refrain from participating in the political processes of the Nation." 5 U.S.C. § 7321. A federal employee may not "use his official authority or influence for the purpose of interfering with or affecting the result of an election." Id. § 7323(a)(1). Moreover, federal employees cannot engage in political activity while on duty, in an agency building, wearing government uniforms, or using any government vehicle. Id. § 7324(a). 388.

113.    GOTV activities unavoidably increase net turnout of whatever party has majority support in the area where the activities occur. Consequently, GOTV activities in geographical areas

favoring President Biden's political party are assured to impermissibly increase voting for such party.

114.    Therefore, GOTV activities cannot be conducted in a nonpartisan fashion—and those concentrated in specified regions and among targeted demographics are partisan—and thus violate the Hatch Act.

115.    Many of these GOTV activities are performed by federal employees on duty, or are performed in a government building, or while wearing a government uniform, or using a government vehicle, all of which further violate the Hatch Act.

116.    To the extent that administrative agencies accept volunteer services from private organizations that have a partisan purpose in their voter registration efforts, those service acts violate the Hatch Act, and therefore the agency's program or policy of accepting those volunteer services facilitates violations of the Hatch Act.

117.    Given the EO's all-of-government approach, Plaintiff believes that all of these categories of Hatch Act violations are occurring in implementing the EO.

118.    The agency actions implementing the EO therefore violate the APA because they are "not in accordance with law." 5 U.S.C. § 706(2)(A). Accordingly, this Court should hold them unlawful and set them aside.

## COUNT V

## VIOLATION OF THE ADMINISTRATIVE PROCEDURES ACT

119.    The APA requires that an agency action cannot exceed the limits of what Congress conveyed to that agency by statute.  *West Virginia v. EPA*, 597 U.S. 697, 723 (2022).

120.    Any federal action regarding elections must be authorized by Congress in a statute.

121.    States have primacy in conducting elections, so federal actions involving elections inherently carry federalism implications.  *See Cook v. Gralike*, 531 U.S. 510, 523 (2001).

122.    For agency actions with federalism implications, Congress must speak with a clear voice authorizing those actions.  *Gregory v. Ashcroft*, 501 U.S. 452, 459-60 (1991).

123.    Under the major questions doctrine, the same clear-statement rule applies to agency decisions of vast political significance.  *West Virginia*, 597 U.S. at 730.

124.    No statute enacted by Congress clearly authorizes the agency actions taken to implement the EO.

125.    Plaintiff has no adequate remedy at law.

126.    The agency actions implementing the EO therefore violate the APA because they are "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. 706(2)(C).  Accordingly, the Court should hold them unlawful and set them aside.

## COUNT VI

## VIOLATION OF EQUAL PROTECTION

127.    Race-based distinctions are subject to strict scrutiny.  See, *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 208 (2023).

128.    By directing federal agencies to target voters for registration based on race, the EO necessarily disfavors potential voters of other races.  Arbitrarily treating voters or potential voters differently violates Equal Protection.  *E.g.*, *Bush v. Gore*, 531 U.S. 98 (2000).

## PRAYER FOR RELIEF

The Plaintiff respectfully asks this Court to:

a.    Declare that EO 14019 violates the Constitution and federal law;

b.    Enjoin the defendant agencies from taking any action to implement EO 14019 or spending any funds or making federal employees or facilities available to implement EO 14019; and

c.    Grant such other and further relief as the Court shall deem necessary and just.

Dated: August 1, 2024                Respectfully submitted,

ANDREW BAILEY
Missouri Attorney General

/s/ Jay Atkins
Jay Atkins, #61214(MO)
First Assistant
Missouri Attorney General's Office
P.O. Box 899
Jefferson City, MO 65102
Tel: (573) 751-7890
E-mail: Jay.Atkins@ago.mo.gov

Counsel for Plaintiff

28